Donna **FERNANDEZ**, Plaintiff,

v.

The **UNITED STATES POSTAL SERVICE**, Defendant. ("Action I")

Donna **FERNANDEZ**, Plaintiff,

v.

Anthony M. **FRANK**, Postmaster General, the United States Postal Service, Defendant. ("Action II")

Nos. CV 87–1265(ADS), CV 89–0679(ADS).

United States District Court, E.D. New York.

Sept. 30, 1992.

---

**450**

Richard V. Rappaport, Great Neck, N.Y., for plaintiff.

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Kevan Cleary, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

SPATT, District Judge.

This case concerns a charge against the United States Postal Service of discrimination based on gender and national origin. The plaintiff, who was a part-time temporary clerk in the Postal Service, contends that she was initially discharged and subsequently denied employment because of her Hispanic "origin" and because she is a female.

## BACKGROUND

The plaintiff, Donna Fernandez ("the plaintiff" or "Fernandez"), is a female of Hispanic origin, and a citizen of the United States. For a short time in 1984, Fernandez was a temporary clerk for the defendant United States Postal Service ("PO").

In Action I (CV 87–1265), Fernandez alleges that from on or about May 21, 1984, at the Hicksville Post Office, she was discriminated against with respect to working conditions, compensation, and terms and privileges of employment due to her national origin. Specifically, Fernandez alleges that she was discharged from employment at that time because of her Hispanic origin, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*).

Fernandez seeks declaratory relief, reinstatement, back pay, compensatory damages and attorney's fees.

In Action II (CV 89–0679), Fernandez alleges that on or about April 3, 1985, she was denied the position of part-time "flexi clerk" with the postal service, at the Seaford Post Office, on the basis of her gender, and she also alleges "reprisal discrimination due to a prior EEO complaint," in violation of Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e *et seq.*). As in Action I, Fernandez seeks declaratory relief, reinstatement, back pay, compensatory damages and attorney's fees.

## THE LEGAL STANDARDS IN A TITLE VII CASE

"Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 20003–2(a), makes it an unfair employment practice for an employer to discriminate against any individual with respect to ... the terms and conditions of employment because of such individual's race, color, religion, sex, or national origin; or to limit, segregate or classify his employees in ways that would adversely effect any employee because of the employee's race, color, religion, sex, or national origin" (*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 645, 109 S.Ct. 2115, 2118, 104 L.Ed.2d 733 [1989]; *see also Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140 [1991]).

■ Title VII expressly prohibits discrimination in employment "because of such individual's ... sex...." In *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), it was noted that the word "sex" was added to Title VII shortly before its passage. When read in the context of the other categories protected under Title VII such as race, color, religion or nationality, the word "sex" refers to membership in a class delineated by gender (*see DeCintio v. Westchester County Medical Center*, 807 F.2d 304 [2d Cir.1986], *cert. denied* 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 50 [1987]).

"Two distinct theories of liability have evolved under Title VII, the first commonly

known as 'disparate treatment,' the second as 'disparate impact.' Under the second theory, plaintiff may prove his case by establishing that his employer maintained a policy or practice that, although fair in form, resulted in a disparate impact upon a special minority" (*Sousa v. Hunter*, 739 F.Supp. 756, 759 [E.D.N.Y.1990] [quotations and citations omitted]).

It is not clear from the complaints in the actions at issue whether Fernandez is alleging "intentional" discrimination or "disparate impact."

■ Disparate treatment "is established under Title VII by proof that plaintiff[s] was treated less favorably than others solely because of his race, color, religion, sex or national origin" (*Zahorik v. Cornell University*, 729 F.2d 85, 91 [2d Cir.1984]). As stated, to establish a discriminatory treatment claim under Title VII, proof of discriminatory motive is "critical." Discriminatory motive can be proved by direct or circumstantial evidence, though most often a Title VII plaintiff "is usually constrained to rely on the cumulative weight of circumstantial evidence" (*Rosen v. Thornburgh*, 928 F.2d 528, 533 [2d Cir. 1991]).

A Title VII claim, including one alleging discriminatory treatment, is adjudicated consistent with a three-step analysis (*see Woodbury v. New York City Transit Authority*, 832 F.2d 764, 769 [2d Cir.1987]). The Second Circuit summarized how a Title VII trial is to proceed:

"The Supreme Court fashioned the manner in which a Title VII action is presented by establishing the now familiar pattern of shifting burdens of proof. Complainant has the initial burden of proving a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate nondiscriminatory reason for its action and, finally complainant must show that the employer's stated reason was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 [93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668] (1973). Once the employer satisfies its burden of production, the inquiry moves to 'a new level of specifici-

ty,' where the plaintiff has the burden of persuading the court 'that the proffered reason was not the true reason for the employment decision.' *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56 [101 S.Ct. 1089, 1095, 67 L.Ed.2d 207] (1981). The plaintiff may carry this burden 'directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' *Id.* at 256 [101 S.Ct. at 1095]" (*Ibrahim v. New York State Dept. of Health*, 904 F.2d 161, 165–66 [2d Cir. 1990]).

(*See also Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 208–09 [2d Cir.1990] [the same standard applies in a retaliatory discrimination case]).

■ Employing step one of this three-part test, the plaintiff can establish a *prima facie* case by proving the following factors: (1) she is a member of a protected class; (2) she applied for and was qualified for the position for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after her rejection the position remained open and the employer continued to seek applicants from persons with the plaintiff's qualifications (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 [1973]; *Rosen v. Thornburgh*, *supra*, 928 F.2d at p. 532; *Lopez v. Metropolitan Life Insurance Co.*, 930 F.2d 157, 161 [2d Cir.1991]). While these factors are not necessarily applicable "in every respect to different factual situations," they "promote the general principle that a Title VII plaintiff must carry the initial burden of offering evidence adequate to raise [ ] an inference of discrimination" (*Meiri v. Dacon*, 759 F.2d 989, 996 [2d Cir.1985], *quoting from Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 [1978]).

■ Once the plaintiff establishes a *prima facie* case, step two requires the defendant to produce "some" legitimate, nondiscriminatory reason for its actions—in the instant case, for its discharge of Fer-

nandez (Action I), and failure to hire her (Action II) (*see Rosen v. Thornburgh, supra,* 928 F.2d at p. 532; *Ibrahim v. New York State Dept. of Health, supra,* 904 F.2d at p. 166).

▇ Finally, under the third step of the analysis, the plaintiff must satisfy her ultimate burden, by a preponderance of the credible evidence (*see Villanueva v. Wellesley College,* 930 F.2d 124, 129 [1st Cir.1991]; *Rosen v. Thornburgh, supra,* 928 F.2d at p. 532; *Sweeney v. Research Foundation of the State University of New York,* 711 F.2d 1179, 1187 [2d Cir. 1983]), that the defendant's stated reasons for its actions are pretextual (*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 [1981] ["The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff"]).

"[U]ltimately, the trial court must decide the question of whether the employer intentionally discriminated against the plaintiff—i.e., it must determine 'whether the defendants' purported business reasons are actually such' " (*Ibrahim, supra, quoting Gibson v. American Broadcasting Co.,* 892 F.2d 1128, 1132 [2d Cir.1989]). "[P]retext can be established by a showing that the 'asserted neutral basis was so ridden with' error that the employer obviously could not honestly have relied on it" or by showing that the reason advanced by the defendant "was unworthy of credence" (*Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1113 [2d Cir.1988] [quotation omitted]; *but see Lopez v. Metropolitan Life Insurance Co.,* 930 F.2d 157, 161 [2d Cir.1991] ["it is enough for the plaintiff to show that the articulated reasons were not the true reasons for the defendant's actions"]).

"Title VII prohibits overt intentional discrimination as well as discrimination resulting from employment practices that are facially neutral but which have a 'disparate impact' because they fall more harshly on a protected group than on other groups and cannot otherwise be justified" (*Waisome v.*

*The Port Authority of New York & New Jersey, et al.,* 948 F.2d 1370 [2d Cir.1991]). To prove disparate impact, "a plaintiff must first identify the specific employment practice he is challenging ... and then show that the practice excluded him or her, as a member of a protected group, from a job or employment opportunity ... Statistical evidence may be probative where it reveals a disparity so great that it cannot be accounted for by chance ... and the 'statistical disparities must be sufficiently substantial that they raise ... an inference of causation' " (*Watson v. Fort Worth Bank & Trust Co.,* 487 U.S. 977, 994, 995, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827 [1988]).

To rebut a finding of discriminatory impact, the employer must prove that the employment practice at issue is used for non-discriminatory reasons. Such a reason can be that the practice serves the employer's legitimate employment goals. The plaintiff must counter with proof that there are "alternative employment practices" that will reduce the disparate impact, so that the reason advanced by the employer was pretextual.

▇ A *prima facie* case of disparate impact is made out by showing either a gross statistical disparity, or a statistically significant adverse impact coupled with other evidence of discrimination (*see, for example, International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 338–340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 and note 20 [1977]; *Bridgeport Guardians, Inc. v. City of Bridgeport,* 933 F.2d 1140, 1146–1148 [2d Cir.1991] *cert. denied* — U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277 [1991]).

"To establish a prima facie case of retaliation, 'a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action' " (*Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59 [2d Cir.1992]; *Johnson v. Palma,* 931 F.2d 203, 207 [2d Cir.1991]; *see also Hollander*

*v. American Cyanamid Co.*, 895 F.2d 80, 85 [2d Cir.1990]).

"Once a prima facie case is made, the burden of production shifts to the defendant to articulate a 'legitimate, non-discriminatory reason' for its actions" (*Johnson v. Palma, supra*, at p. 207 *citing Taitt v. Chemical Bank*, 849 F.2d 775, 777 [2d Cir. 1988]).

"If the defendant meets its burden of articulating 'a permissible reason for its actions, the plaintiff must then show that the reasons advanced were pretextual'" (*Kotcher v. Rosa and Sullivan Appliance Center, Inc., supra*, 957 F.2d at pp. 64–65; *citing from Sumner v. United States Postal Service*, 899 F.2d 203, 209 [2d Cir. 1990]).

■ As stated in *Newsday v. Long Island Typographical Union*, 915 F.2d 840, 844–845 (2d Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991), opposition to unlawful sexual discrimination is protected activity within the policies of Title VII:

"Title VII places upon an employer the responsibility to maintain a work place environment free of sexual harassment. * * * The EEOC Compliance Manual further provides that employers should create a procedure for resolving sexual harassment complaints that encourages victims of sexual harassment to come forward. It should ensure confidentiality as much as possible and provide effective remedies, including protection of victims and witnesses against retaliation."

### THE TRIAL

Having outlined the appropriate framework for the trial of plaintiff's Title VII claim, the following constitutes the Court's review of the evidence, findings of fact and conclusions of law (*see* Fed.R.Civ.P. 52[a]). During this discussion, the Court will make findings of fact which will be supplemented by additional findings later in the opinion.

### THE PLAINTIFF'S CASE

The plaintiff DONNA FERNANDEZ is an Hispanic woman who wanted to work for the United States Post Office on a career basis. On April 30, 1984 she was hired by the Post Office as a "casual worker." According to the plaintiff, a casual worker is employed for ninety days and is then evaluated. If qualified, the worker will be employed for another ninety days, for a maximum of three ninety-day periods or a total of nine months.

When the plaintiff was interviewed for the job, she signed a memorandum stating that "at times she may be required to do heavy lifting." She took a physical examination and was placed on an eligibility list for permanent career opportunity. The plaintiff introduced a document entitled "Certificate of Medical Examination" (Plaintiff's Exh. 20) signed by the plaintiff on April 3, 1984, which states the duties of a casual worker as follows:

"*CASUAL*

MAY BE REQUIRED TO PERFORM ANY COMBINATION OF THE FOLLOWING FUNCTIONS:

MAILHANDLER—primarily loads, unloads bulk mail. Up to 10 hours of continuous heavy physical activity.

CARRIER—responsible for delivery and collection of mail on foot and by vehicle. Requires arduous exertion involving prolonged standing, walking, distributing, and may involve handling sacks of mail up to 70 pounds. Outside assignments are performed in all types of weather.

CLERK—requires continuous standing, distribution of mail, stretching and reaching. Handles heavy sacks of mail and parcel post weighing up to 70 pounds."

In addition, the United States Postal Service Qualification Standard for distribution clerk (Plaintiff's Exh. 12) states the following:

"1. **Clerks.** Clerks handle heavy sacks of letter mail, paper mail, and parcel post weighing up to 70 pounds and sort and distribute mail to post offices and to carrier routes in accordance with established schemes.

. . . .

### 3. Physical Requirements

Applicants must be physically able to perform efficiently the duties of the position which require arduous exertion involving prolonged standing, walking, distributing, and reaching, and may involve the handling of heavy sacks of mail."

Fernandez was notified to report for work as a casual worker in the Bethpage warehouse. On April 30, 1984 she reported for orientation at Hicksville. At the orientation she was shown a film which demonstrated the proper way to lift heavy objects. As to lifting, she was told "if it was too heavy, don't pick it up." There is no doubt that heavy lifting was an integral part of her job as a casual worker.

The plaintiff reported to the Bethpage warehouse where she sorted mail. She also lifted twenty-five pound "file boxes" loaded with first class mail. In her second week on the job, she lifted, by herself, twenty-two sacks of mail that weighed fifty to seventy-five pounds each, and carried the sacks to the next conveyor belt about seven feet away. Fernandez testified that she was assigned to this heavy lifting work because one of the men went out to dinner. Her supervisors at Bethpage were Nicholas John Del Rossi and Gerard Carmine Benevento.

Fernandez believes that she was treated differently than other casual workers because she was Hispanic. She stated that she was watched constantly by Benevento and if she talked, he kept telling her to "shut up and move the mail." She testified that Benevento harassed her day after day starting on May 6, 1984. He kept saying to her "keep your mouth shut and move the mail." According to the plaintiff, he didn't "pick on" any other employees. On one occasion, Benevento made a "crack" in Italian. Moreover, Fernandez testified that Benevento humiliated her in front of other co-employees.

After being harassed by Benevento, Fernandez kept a log to record the days and hours she worked. She also got into a dispute about the days she actually worked. The day after Fernandez lifted the fifty to seventy-five pound bags, she felt chest pains. The pain got worse and she saw a doctor on her day off. She continued to work with severe chest pains and pain in her neck, shoulder and arm.

On May 16, 1984, she visited Dr. Ji–Ming Huag, her family doctor, who said she pulled the pectoral muscles in the chest. He prescribed a painkiller and bed rest. She could return to work but he advised no heavy lifting for two weeks. Fernandez stayed home two days from work. When she returned to work, she brought in a doctor's note and gave it to her supervisor. Supervisor Del Rossi asked her into his office, called her a liar, and referred to the note as a "piece of garbage." Fernandez said "prove it" and Del Rossi told her to get out and do her work. Benevento told her "one more absence and you're fired."

Fernandez testified she was being harassed because she was Hispanic and that other female employees were not similarly mistreated. As an example, she relates that a Ms. Dickson took two days off and no one said anything to her. After her return to the job, Fernandez worked only three more days. On May 21, 1984, Benevento told her "you're fired and get the hell out of here, right now." She stated she would not leave until she saw Del Rossi. When Fernandez saw Del Rossi he said "You're fired, get the hell out." Fernandez then told Del Rossi that she was going to report him. No one ever told her why she was terminated.

Fernandez went to the EEOC office the next day and filled out a form. In addition, she made a complaint through the Union, which filed a grievance on her behalf. She also wrote to the Postmaster General of the United States.

Prior to these incidents, Fernandez had applied for the Post Office position of part-time flexi clerk. She took the Civil Service carrier clerk test in 1983. She passed the test, was put on the eligible list, and was interviewed for the position of part-time flexi clerk by Alphonso Rocco, the Postmaster of the Seaford Post Office. At the interview, Postmaster Rocco showed her around the loading dock and told her that she would have to load and unload trucks.

It is significant that Rocco emphasized the heavy lifting involved in the job.

Prior to the interview, she was told by her union representative to tell the interviewer (in this case Rocco) what had occurred when she was discharged as a "casual worker" in the Bethpage warehouse in May 1984. Her testimony in this regard was as follows:

"Q Do you believe that Mr. Rocco discouraged you from taking the position?

A He asked me, he said because I stated that I worked before as the casual and I told him I got hurt. And I was told to tell him through the union rep. He says when you go in through—for your interview, you tell him exactly what you did before in the job in Hicksville. Tell him everything that happened.

*I told him that I won't stand a chance of getting a job if I am going to put down that I got fired.*

He said tell him everything. Bring the doctor's note with you and tell him that you have an EEO complaint going and from there he says you will call me up and you will tell me exactly how the interview went.

Q And you presented a doctor's note to Mr. Rocco at the interview; is that correct?

A Yes.

Q And what reaction did Mr. Rocco have to the note?

A He said how did this happen and what did you do?

I told him exactly what I did. After that he still showed me around. He showed me what the job consisted of. And I told him, I said I think I am capable. I said I want to have the opportunity to take the chance and offer me a position with the post office.

And from there he just said I will just show you around, he said, and I will get back to you" (Tr. at pp. 354–355) (emphasis supplied).

Rocco suggested that she might become an LSM operator, because "there is less work, no lifting, sitting down and typing." The function of the LSM machine was ex-

plained later in the trial, in the testimony of Alphonso Rocco, as follows:

"Q The LSM machine, let's focus on that.

Is there something demeaning about being assigned to an LSM machine in the post office?

A It is a lot cleaner operation. It is involving less manual dexterity of any kind. It is eye trained, mostly women for LSM. They enjoyed it because it was a clean type of work. You don't have to handle heavy sacks. You sit down for 30 minutes at a machine and get up for fifteen minutes. It was really a type of work that most people preferred, to be a part time flexi, I would say, physically if they like cleaner work" (Tr. at p. 164).

Because of the easier physical requirements, "ninety percent of the people working on the LSM were women" (Tr. at p. 181).

Fernandez responded to this suggestion by Rocco that she might become an LSM operator, as follows:

"Q Did Mr. Rocco suggest to you, you might become an LSM operator?

A He told me I should take an interest in that. There is less work, no lifting, sitting down, and typing. And I don't like typing at all. That's why I didn't even take a test for that. I wasn't interested in typing.

Q Did you tell him that?

A I wasn't interested. I just said I wasn't interested in LSM machine. I took the test for clerk carrier and that's what I am interested in."

Fernandez testified that she believed she was qualified for the position of part-time flexi clerk, had recovered from her injuries and was physically able to do the job. She believes she was not hired in 1985 due to retaliation against her because she had been previously fired and in view of her prior EEOC complaint.

The plaintiff testified about her prior and subsequent employment history. She worked for the Seaford School District for twenty-five years as a teacher's aide. She also worked in retail stores. However, she was not formally trained for any career.

Since 1985, she has worked in retailing as an "on-call" person and she also had part-time employment with the Seaford School District. Apparently Fernandez looked for full-time employment in 1984 but gave up that quest by 1985. During the period 1985 to 1991, she was turned down by three banks, and "was totally discouraged."

On cross-examination, it was brought out that the post office clerk's position was really not the type of job she anticipated, as follows:

"Q So, the job you saw when you arrived at the post office was not the job that you envisioned based upon this manual?

A When they said clerk I figured it is a diversified job in the local post office where you are going to do everything, you are going to have a little time to do every spot that you took the test for and that you should be training for.

*I didn't expect to hear that you are going to be a truck driver's helper or a warehouse clerk. I didn't really expect to hear that. But this is what the job was.*

. . . .

Q Isn't it true that the post office job that you got, not what you envisioned, but what you got was a manual laborer's job and you didn't feel comfortable with it?

A After I saw it in the casual spot I thought I was going to do the manual labor just for a short time and then proceed with what I was doing before.

Q You didn't envision yourself lugging big dirty sacks around, isn't that right?

A I was told when I went to fill out the application and there was a little form to fill out that said at times you may be required to lift heavy sacks.

Q You thought it was incidental and not something to be happening on a daily basis?

A *I didn't expect that to be your job, lifting sacks of mail.* When it said casual clerk I expected to do everything. There were a couple of girls in that area

sitting in the corner not lifting the mail and sorting the mail that was ripped on the machine. They were assorting that and putting it together.

I thought I would get a chance to do that and I never had the opportunity. All I was doing was lifting.

Q You heard Romano, he is a man, the guy who testified, Michael Romano? Did you hear him complaining he has heavy work in the post office, the lugging?

A He has a back problem, too" (Tr. pp. 377–379) (emphasis supplied).

Fernandez admitted that Michael Romano, a male postal employee who did the same work she did, also complained about the heavy lifting even though he was a male, non-Hispanic. Also, significantly, Fernandez agreed that lifting heavy weights is part of the job:

"Q Didn't Romano complain of the same thing, getting stuck with the same lifting?

A Yes.

Q He is not Hispanic or a woman.

A I recall he made a complaint with the post office.

Q Sure, he did.

A He called in and made a complaint that he was being taken advantage of. I remember him bringing that up when he was in the office.

Q Don't you see that maybe it goes with the job?

A It's part of the job. But I didn't expect them to say, 85 percent of the job is lifting. You are trying to tell me that this is a weight lifting job and it is not a carrier clerk job. *So they should specify that this job is weight lifting and truck driver's helper and not just clerk carrier* " (Tr. at p. 380) (emphasis supplied).

Fernandez further conceded that she was not totally mistreated at the Hicksville Post Office. In fact, her supervisors granted her request to change her hours of employment so that she could get a car ride home (Tr. at pp. 384–385).

Although at one time Fernandez put in a claim that she was being discriminated

against as a handicapped person, namely with regard to a "bad back," she ultimately changed her complaint to discrimination based upon her sex. Indeed, at the trial she testified that she never had a bad back. She contends that Rocco discriminated against her because of her sex, by selecting Michael Romano over her. However, she concedes that she could not lift eight hours a day, as the job sometimes required:

"Q You saw what lifting was all about, but didn't you learn that lifting wasn't for you? Not everybody can lift?

A Not eight hours a day. I wouldn't perform eight hours a day of lifting. I am not qualified for that. But the post office says at times you may be required to do heavy lifting" (Tr. at p. 393).

When it was pointed out that Romano also complained of the heavy lifting involved in the flexi clerk job, Fernandez stated that "I get the feeling that he is being taken advantage of, too" (Tr. at p. 393). Nevertheless, even though she conceded she could not do the lifting part of the job as well as Romano, she felt she was "qualified for the job." However, in this regard she frankly conceded that Romano "is a male and built better than me and more capable of doing the job" (Tr. at p. 394).

Fernandez conceded that although she now works full time, between 1984 and 1987 she worked only part-time and not very productively, as follows:

"Q What year?

Let me try to refresh your recollection.

The record you provided seems to indicate as I have distilled it from your tax returns that in 1984 you made about one thousand dollars and you worked for Sears and A & S, okay?

A That was just the two months.

Q Seasonal?

A Two months.

Q '85 you worked for J.C. Penny (sic) and A & S and made about $700?

A That was five weeks only.

Q '86 you worked for J.C. Penny (sic) and made about 1,500?

A '85?

Q '86; is that right?

A Well, yeah.

Q '87 you worked for Sterns and J.C. Penny (sic) and you made about 1,300?

A In Sterns the first year, yes.

. . . .

Q And you are telling me that you gave up looking for full-time employment because three banks turned you down?

A That's enough. Where am I going to go? I am not going to go to no job going to pay me $4.20 an hour when I had an opportunity to work at the post office at a rate of $10.25 an hour.

Q So, if you couldn't get a job in the post office you don't want to work anywhere?

A If I can't meet the same salary which I thought I was qualified for, where do I stand" (Tr. at pp. 372–400).

ANN FEHLING also took the examination for part-time flexi clerk for the post office in 1985. She placed fifth on the "List of eligibles being considered for appointment," dated April 14, 1985, with a score of 87.80 (Plaintiff's Exh. 7). The plaintiff placed twelfth with a score of 80.30 on the same list. At the interview, she recalls that she was told "there would be lifting involved" (Tr. at p. 71).

Fehling was offered a position at the Massapequa Park Post Office but she turned it down because it paid less money than her then Social Security Administration job. She never had a job involving heavy lifting, but she thinks she can lift fifty pounds. With regard to the post office interview, Ms. Fehling testified to the following:

"Q The individual that interviewed you at the post office, in Seaford, did he tell you that night work wasn't appropriate for women? Did he tell you anything like that?

A No.

Q Did he tell you that you might be better off if you worked on a letter sorting machine rather than as a port (sic) time flexi-clerk?

A No. I don't remember that.

**458**

Q Did he discourage you from applying for the job?

A Not that I remember, no.

Q Did you feel unwanted there like you were imposing on him?

A Like I was what?

Q Imposing on him? Did he make you feel uncomfortable being there?

A I wouldn't say that, no.

Q You feel you were being treated appropriately by him?

A Yeah, I had no problem.

Q And ultimately another post office did offer you a job, didn't they?

A Yes.

Q Which you turned down?

A Yes" (Tr. at pp. 83–84).

MICHAEL S. ROMANO testified that he was employed at the Seaford Post Office since April 13, 1985 as a Distribution Clerk. He took the same test as the plaintiff and Ms. Fehling, was interviewed by Alphonso Rocco and was hired. At the interview, he was questioned with regard to lifting, as follows:

"Q Did Mr. Rocco discuss during your interview that lifting of heavy objects was required?

A Uhm, I might recall he might have mentioned that, would you have a problem lifting a 70 pound bag? Would that be a problem for you? And I said no, that it wouldn't be a problem but he didn't go in depth about lifting. He didn't spend five or ten minutes on lifting. He just asked that one question. Would you have a problem lifting a 70 pound bag? And I said no."

In April, 1985, there were four other part-time flexi clerks in the Seaford Post Office, three men and one woman, Louise Shaeffer. At the present time, Romano is a permanent employee, his title was changed to regular distribution clerk but "the work is the same." In 1985, there were four other part-time flexi clerks and they all became permanent full-time clerks without a further examination.

Douglas Sharp was also on the same List of Eligibles as the plaintiff. He placed five slots higher than Fernandez. Sharp was appointed a part-time flexi clerk and became a regular clerk before Romano.

Louise Shaeffer, who had been a carrier, also started as a part-time flexi clerk with Romano on April 13, 1985 and ultimately became a window distribution clerk. She also did lifting. Romano explained the lifting part of the job for all the flexi clerks, including Shaeffer, as follows:

"A Well, she was—we all were under the umbrella of lifting. All the employees are all under the umbrella of lifting. The amount of lifting varies. It varies day-to-day. Some employees might lift more than others, some—*there's always lifting, okay.* Either lifting a letter, a window drawer or lifting a magazine or lifting a bag.

*There's lifting all through the day.* The difference is the weight in lifting, okay. But you can't do that generally without lifting something. Lifting a tray of mail. *Basically the backbone of the job is lifting. You can't move the mail without lifting it*" (Tr. at p. 96) (emphasis supplied).

As to the lifting by Louise Shaeffer, in particular, Romano stated:

"Q Did Louise Shaeffer do any lifting of objects 50 pounds or more?

A Yes.

Q How often?

A Not very frequent, but again we are all under that umbrella of lifting. But it was not, not every day, not every day, lifting heavy bags. But there was always lifting. Like I said letters or, you know, anything, a flat, anything that is involved in moving the mail" (Tr. at pp. 96–96).

Romano further testified that the "bottom person would do the heavy work" until the next junior person came along. Even with a medical note, Kevin Kennedy, another one of the clerks, had to lift. Romano emphasized that, "You can't do that job without lifting something." Not only was there heavy lifting, but there was also pushing and pulling, as follows:

"Also in lifting, there's also pushing and pulling, okay. You have to push carts of mail or pull skids of mail. So involved

with lifting there's pushing and theirs (sic) pulling. And pushing and pulling can—if I was to push a postcard, it will be filled with sacks of mail and it would weigh more than 50 pounds. You are talking about a couple hundred pounds" (Tr. at pp. 99–100).

In addition, he had to push and pull "post cans" which are "containers that they throw the sacks of mail in. They have the four wheels and roll-abouts and you push them."

Apparently the persons employed in these part-time flexi clerk jobs often sustained injuries. Kevin Kennedy hurt his back and was placed on light duty, as was Louise Shaeffer. In fact, of the five people who were part-time flexi clerks when Roman started working, he was the only one with a normal back.

When Romano was first hired at the Seaford Post Office in April, 1985, Alphonso Rocco was the Postmaster. There were fifty to fifty-five employees at the Seaford post office at that time, including carriers and clerks. Of these employees only one woman was a flexi clerk and two women were carriers. At the present time there are approximately eight females at the Seaford post office.

### The Defendants' Case

GERARD CARMINE BENEVENTO is a supervisor in the Postal Service. In 1984, he supervised the plaintiff at the Hicksville facility. The plaintiff was assigned to an operation which cancelled the incoming mail prior to its being delivered the following day. Part of the operation consists of the employees' removing sacks of mail off skids and onto moveable belts, "culling" the mail on the belts and hand cancelling the "fat" mail. Benevento testified that the plaintiff was not a good employee in that she was "an excessive talker." While he stated he did not object to workers talking while working, Fernandez was "doing so much talking, that you are doing no work, that creates a problem" (Tr. at p. 129). He stated that he complained "privately" to her about this problem several times. Benevento denied that he "yelled"

at her. He admitted he kept close supervision over all the employees. He stated that the plaintiff complained about getting only $5.00 an hour and that it was a "man's job." In his opinion, Fernandez "wasn't physical enough to lift sacks."

Benevento testified that there were other women and Hispanics working in the Hicksville Post Office at that time. He stated that if the object to lift was too heavy, he would provide help for such an employee.

NICHOLAS JOHN DEL ROSSI was a supervisor at the Hicksville Post Office in 1984. He testified there was an Hispanic supervisor at that post office. He got along so well with Ms. Betty Lamatina that she personally gave him a briefcase on his transfer to Fort Lauderdale.

Del Rossi remembered the plaintiff being discharged because she was hostile and was yelling at him. He testified that he told her "if she didn't leave my office, I would call the police." Not only did he deny doing anything to provoke her, but he "never laid eyes on the woman before." Further, Del Rossi stated that he would never say that her doctor's note was a piece of garbage.

ALPHONSO ROCCO was the Postmaster of the Seaford Post Office in 1985. He hired employees from a worksheet listing persons eligible for appointment. In hiring, he used the familiar Civil Service "one in three" rule. He interviewed the plaintiff. She "was very open, very courteous, talkative." However, Fernandez told him some things that caused him to decide not to hire her. She told him that she injured her back lifting and that the bags she lifted were "too heavy." Rocco testified that some of the mail bags could weigh up to seventy pounds. Concerning the work at Seaford, he was asked about the criteria for a flexi clerk, as follows:

"Q And in selecting someone for the job what was your primary focus in terms of what they could do?

A My primary focus was that the person had to be physically able to perform it, because the job in Seaford demanded the person be competent in unloading by

themselves three morning trips and one afternoon trip. And there is a late afternoon trip also. There is basically five trips they basically do on their own. And particularly the too (sic) early ones. There is no one there, but the part time flexi and the driver" (Tr. at p. 162).

Of all factors in selecting candidates for the flexi clerk position, the most important was lifting.

"Q Were these criteria or factors, were they weighted or were they equal?

A Well, in my office we had to put one criteria above all the other criteria, and that was that the lifting part was going to be a major part of the job. Therefore, that consideration was given the highest priority in my office.

Q Did you give a percentage, a certain percentage of weight to that criteria?

A On a scale to—a scale of one to ten I would put that around eight. '

Q You are saying 80 percent of the job involved lifting?

A No. I am saying approximately 50 percent, 60 percent was the lifting part of the job.

Q But isn't it true that there were part-time flexi clerks who did little or no lifting at all; is that correct?

A That's not correct.

Q The part-time flexi clerk at the window—

A There was no part-time flexi clerks at the window.

. . . .

Q Were there any other part-time flexi clerks who did little or no lifting?

A *All part time flexies were required to do lifting, unload the trucks. That's what their primary job was,* and I believe we had two at that time in the office" (Tr. at pp. 183–184) (emphasis supplied).

Rocco testified that the best carrier he had in Seaford was a woman named Ann Swital. He stated that she worked efficiently, with physical stamina and is still employed in that capacity.

With regard to his policy of hiring women at the Seaford Post Office in 1985, Rocco denied that he had a policy of confining women to LSM machines and denied that he declined to hire the plaintiff because she was a woman and Hispanic. In fact, Rocco said the plaintiff told him "she might have a back problem" and so he recommended her working on an LSM machine, which she declined.

On cross-examination, Rocco said he offered the job to Ann Fehling but she declined to accept the position. Significantly, in his hiring practices, Rocco recognized that there were fewer female employees than male employees in the Seaford Post Office at that time, in the following testimony:

"THE COURT: Let's find out.

When you say you took into consideration that there were less female employees than male employees, what did you mean by that?

THE WITNESS: I meant by that if I had three people and they were all equally qualified, I would now take out of the three the women first or a minority person first, *because that was a mandate from the division.*

THE COURT: When you say now, are we talking about at the time of this occurrence?

THE WITNESS: Yes.

THE COURT: So when you say take into consideration, you meant that you would give preference to a woman or a minority?

THE WITNESS: Yes, we would.

. . . .

Q You indicated earlier that affirmative action did not require you to take women over men for positions; is that correct?

A It's not true. Affirmative action mandated the postmaster to give every opportunity to women over men" (Tr. at pp. 174–175, 189) (emphasis supplied).

It was apparent that in 1985, there were very few women and Hispanics in the Seaford Post Office. On March 23, 1985, there were forty-eight male employees, two female employees and one Hispanic employ-

ee. As a result, the Seaford Post Office had an affirmative action program in effect and Rocco was "required to hire female employees who were qualified for positions before (he) hired male employees" (Tr. at p. 178).

The plaintiff had two interviews with Rocco, both for the position of part-time flexi clerk. Rocco commented that the interviews were unusual because Fernandez told him that she had hurt her back and, because of that condition she had been fired in 1984 at Hicksville. Indeed, she told Rocco that she was angry because she was fired. The Court credits this testimony and finds that this was a non-pretextual, non-discriminatory reason for an employer to decline to hire such an employee for a position that required daily, repeated heavy lifting. Rocco testified that Fernandez didn't qualify for the part-time flexi clerk position, even with the added advantage of the affirmative action program.

However, notwithstanding this effort to try to hire female flexi clerks, over a five-year period, Rocco was only able to hire four females and more than twelve males. Rocco was closely questioned by plaintiff's counsel concerning the small number of female and Hispanic employees hired in the Seaford Post Office. However, in the case of the plaintiff, she was applying for part-time flexi clerk which was not a permanent position and required heavy lifting as an essential part of the job. According to Rocco, the plaintiff was rejected solely because of her inability to fulfill the duties of the position insofar as heavy lifting and other physical work is concerned. He explained:

"Q That's not it either. Here it is, this is it. And you are on the right page, page 4. If you recall, Mr. Rappaport, plaintiff's counsel, went through all the numbers comparing the numbers of females and males that you selected for these jobs at your post office, do you recall that? A Yes. Q And isn't it true that a lot of women were not interested in this job? A Correct.

Q Why weren't they interested? A Because the connotation part-time flexi clerk meant to them they would sit at a desk and work like a secretary would or file clerk. And we have explained the position to them that it would entail a lot of physical labor as well as that aspect. And many of them would turn it down" (Tr. at pp. 308–309).

The record shows that a number of women were offered jobs at the Seaford Post Office and declined such positions, for various reasons (*see* Tr. at pp. 310–313). However, Rocco testified that no one ever came to an interview for a job requiring heavy lifting "with a doctor's note in her hand" complaining of a back injury, as did the plaintiff. Also, no one came to such an interview with a narrative that she had already been treated unfairly and was fired at another nearby post office facility.

Controverting the plaintiff's testimony, Rocco testified unequivocally that the plaintiff told him she had hurt her back lifting at the Hicksville Post Office:

"Q Those were not the words she used? A Her words were she hurt her back. Q You said you assumed she hurt her back? A When she says to me she hurt her back I have to assume she is telling the truth. So I accepted it at face value that she injured her back. She described what she was doing at the belt. She explained everything in detail, she was working on the belt. There was no help given to her. She was dumping these bags and her back hurt her. And she went a day or so later to a doctor, and she said she could not lift up any more bags.

I don't want investigate [sic] a doctor's note. No one ever gave me a doctor's note before on an interview. It is a very unusual practice. I mean, it is not usual. Q What did you do with the doctor's note? A Nothing. I just returned it to her.

. . . .

Q Did you ask her any further questions about it?

A No.

I was only interested about selecting a person who would be able to do the job well, and that's why I didn't pursue anything. She was telling me things that were not necessary." (Tr. at pp. 323–324 & 328).

### *The Civil Rights Act of 1991*

 Notwithstanding the invitation by the plaintiff's attorney, the Court declines to address the issue of whether the Civil Rights Act of 1991 is applicable to this case. No motion to amend the Complaint was made prior to, during or even after this bench trial. While the defendant gratuitously raised the issue in its "Proposed Findings of Fact and Conclusions of Law" (*see* pp. 18–21) and the plaintiff discussed the issue in her "Reply," this complex and controversial issue is worthy of a formal motion and the exchange of memoranda of law prior to trial. If the Court should consider this an action under the 1991 Civil Rights Act, the plaintiff would possibly be entitled to a jury trial and the Court would conceivably have to allow the introduction of additional evidence. Since there is no formal application before me and the plaintiff failed to properly and timely raise the issue, even to the present time, this new statute will not be considered by the Court in the determination of this case.

### ADDITIONAL FINDINGS OF FACT

1. The record does not support the plaintiff's contention that she was discriminated against because she was a woman or an Hispanic.

2. On the contrary, the Court finds that the plaintiff was discharged as a casual worker in 1984 and not hired as a part-time flexi clerk in 1985 because of her own conduct in being unable or unwilling to do the heavy lifting and physical labor inherent in these positions, and indispensably required for both positions at issue.

3. The plaintiff failed to establish that she was denied employment with the Postal Service in 1985 because of reprisal or retaliation for her filing a prior EEOC complaint.

4. Although the statistics reveal that there are fewer women in the positions at issue, there was no evidence adduced that this statistical result was occasioned by any discrimination. On the contrary, the Court finds that this statistical result was, in major part, due to the required heavy lifting inherent in these positions and was not due to a selection process based on gender or national origin.

### DISCUSSION AND FURTHER FINDINGS

 Initially, the Court finds that the plaintiff has failed to establish a *prima facie* case of discrimination based on gender and/or national origin. The plaintiff is clearly a member of a protected class, namely female and Hispanic. The testimony demonstrates that she did apply for the positions at issue in this law suit, and that she was discharged and rejected for the respective positions. However, the Court finds that she was not qualified either for the position of temporary "casual worker" in 1984 or part-time flexi clerk in 1985. The Court also finds that Fernandez was either not physically capable or was unwilling to do the heavy lifting and other physical labor that was an integral part of these positions.

It is clear that she became physically ill within days of starting her casual worker position in 1984 due to the lifting. It is equally clear that in 1985 she applied for the flexi clerk position armed with a doctor's note advising her potential employer of physical problems. She also was quick to warn her potential employer that she had made prior complaints. Therefore, the failure to employ the plaintiff in 1985 was a reasonable and non-discriminatory reaction to a potential employment problem by someone who did not have the physical ability to do the work and was apparently spoiling for a fight, in advance.

 However, even assuming that Fernandez made out a *prima facie* case of

discrimination, the Postal Service has clearly established non-discriminatory reasons for both her discharge in 1984 and the failure to employ her in 1985. The significant valid and non-discriminatory reason underlying both her discharge in 1984 and the failure to employ her in 1985, was her inability or unwillingness to do the physical lifting and other physical work required for both positions.

In sum, a review of the evidence in this case leads the Court to conclude that there was no proof of any discrimination against the plaintiff because she is a woman or an Hispanic. The proof is clear and certain that the plaintiff's employment difficulties were caused by her inability to do the heavy physical work required as a casual worker and as a flexi clerk.

It is also clear that, as in other employment settings, pretextual discharge cannot be tolerated in the United States Postal Service. For example, in *Sumner v. U.S. Postal Service,* 899 F.2d 203 (2d Cir.1990), a post office "part time flexible subcarrier" after a three and one-half year employment, was discharged by his immediate supervisor for disrespect to a supervisor and failure to obey a direct order. The District Court's judgment dismissing the complaint was reversed by the Second Circuit. The Court held that "sitting on a carrier case" was not a very serious infraction, especially since a post office employee testified that "in his thirty-five years of postal employment he had never heard of anybody being discharged for doing so." Further, an alleged insubordination charge was not serious and was provoked. The Court found that the reasons articulated by the post office for firing Sumner were pretextual and the discharge was based on impermissible motives under Title VII.

However, a review of the precedents reveals that the same problem facing plaintiff Fernandez, namely heavy lifting, has occurred on other occasions with regard to Postal Service employees. *Gilbert v. Frank,* 949 F.2d 637 (2d Cir.1991), a Rehabilitation Act case, involved a similar job title in the Postal Service, namely a Manual (Mail) Distribution Clerk, part-time, flexible

schedule. In *Gilbert,* the plaintiff was rejected for this position on two occasions because of a serious kidney disease which required dialysis treatments. The District Court found that the positions for which Gilbert applied "required that plaintiff be capable of lifting seventy pounds" and that, because of his medical condition, plaintiff could only lift up to twenty-five pounds. The District Judge noted in his opinion that the Manual MD Clerk

"is a position in the Postal Service which involves continuous standing, stretching, and reaching. Clerks may be required to handle heavy sacks of letter mail or parcel post weighing up to 70 pounds. Such clerks are also called upon to carry packages and to push heavy postal wheeled containers. The lifting, carrying and moving of such objects are among the 'essential functions' of the MDC. The job is clearly one which calls for extended strenuous physical exertion."

The District Court further found that the lifting and handling of seventy-pound mail bags were essential functions of the MDC Clerk's job. In *Gilbert,* the handicapped plaintiff argued that he was fully capable of handling seventy-pound mail sacks. After hearing extensive medical testimony, the District Judge found that Gilbert was not physically able to perform the essential Manual MDC Clerk functions.

In affirming, the Second Circuit found that the evidence supported the finding that "Gilbert was not able, without accommodation, to perform the essential functions of the Manual MD Clerk position." Further, the Court held that an "accommodation" was not reasonable in that heavy lifting was an essential function of the job, as follows:

"The suggestion that the lifting and handling requirements might be waived for Gilbert was not a suggestion for reasonable accommodation since *these tasks were essential functions of the job.* The suggestion that coworkers might perform this part of Gilbert's job as Manual MD Clerk *likewise sought the elimination, for Gilbert, of essential functions of the job.* We note that the Postal

Service witnesses' responses to the trial questions containing these suggestions did nothing to supply the gaps in Gilbert's prima facie case. The witnesses, who were, respectively, managers of operations and personnel, stated that having a coworker do the heavy lifting for Gilbert would not be a reasonable way to operate for several reasons, including (1) the fact that Gilbert would not know until he attempted to lift a sack how much it weighed, and the very attempt to handle a too-heavy sack could thus pose a danger to Gilbert and his coworkers; and (2) having two workers performing tasks that one worker is assigned would slow down and reduce the productivity of the operation.

Since, as discussed above, *'reasonable accommodation' does not mean elimination of any of the job's essential functions*, we conclude that the district court correctly ruled that Gilbert had failed to establish a prima facie case under the Act" (949 F.2d at p. 644) (emphasis supplied).

Crucial to this determination is the settled rule that Title VII did not remove the basic requirement that an employee must be qualified to do the job. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), the Court reiterated the "qualification" requirement, quoted with approval in *McDonnell Douglas*, as follows:

> "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group."

## CONCLUSIONS OF LAW

1. The Court finds that the plaintiff has failed to establish a *prima facie* case of discrimination based on gender or national origin, because she was not qualified to perform either of the positions involved in this case.

2. Moreover, the Court finds that the defendant articulated clear and convincing evidence of a legitimate non-discriminatory reason for discharging the plaintiff as a casual post office worker in May 1984, namely her inability or unwillingness to do the heavy lifting involved in the performance of that position.

3. Further, the Court finds that the defendant articulated clear and convincing evidence of a legitimate non-discriminatory reason for the failure to employ the plaintiff as a part-time flexi clerk in 1985, namely her advising the hiring supervisor of her physical injury while lifting in 1984, as evidence of her inability to do the heavy lifting required for that position.

4. Accordingly, the Court finds that the defendant has satisfied its burden of producing specific, objective, competent evidence (*see Sweeney v. Research Foundation of the State University of New York*, 711 F.2d 1179, 1185 [2d Cir.1983]) that its discharge of the plaintiff in 1984 and its failure to hire the plaintiff in 1985 was not based on sex or national origin, but was based on the plaintiff's inability to do the heavy lifting which was an essential element of both positions, as outlined above, and that the plaintiff's inability to physically perform was a legitimate and non-discriminatory basis for her discharge in 1984 and the defendant's failure to hire her in 1985.

5. The Court finds that the plaintiff failed to establish that the defendant's stated reasons for discharging her in 1984 and failing to hire her in 1985, were pretextual (*see Gilbert v. Frank, supra*).

6. In addition, the plaintiff failed to establish that she was denied employment in 1985 because of reprisal or retaliation for her filing a prior EEOC complaint.

7. Finally, the Court finds that the plaintiff failed to establish that she was discharged in 1984 and denied employment in 1985 as a result of discrimination against her by reason of the fact that she is a female of Hispanic descent.

## CONCLUSION

Accordingly, for the reasons stated, the Court directs the entry of a judgment in favor of the defendant, dismissing the complaints in both actions.

SO ORDERED.